# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN - MILWAUKEE DIVISION

---

ESTATE OF RANDY D. GLENN, Jr., by
his Special Administrator, SACHET GLENN,
and SACHET GLENN, Individually,
A.A.G., a minor, A.Z.G., a minor,
A.C.G., a minor, and A.D.G., a minor,
by their mother and guardian,
SACHET GLENN,

        Plaintiffs,

  v.

WAUKESHA COUNTY,
ERIC J. SEVERSON,
JOHANNA J. GRACE,
ZURICH AMERICAN INSURANCE COMPANY,
UNIVERSAL UNDERWRITERS OF TEXAS
INSURANCE COMPANY,
ABC INSURANCE COMPANIES and
DEF INSURANCE COMPANIES, the fictitious
name for unknown insurance companies,

        Defendants.

Civil Action No. 2:25-cv-2050

**<u>COMPLAINT</u>**

---

    NOW COMES the above-named plaintiffs, the Estate of Randy D. Glenn, Jr., by Sachet Glenn, his special administrator, Sachet Glenn, individually, and their minor children, A.A.G., A.Z.G., A.C.G., and A.D.G., by their mother, Sachet Glenn, and the law firm of GINGRAS, THOMSEN & WACHS, LLP, and as for their claims for relief against the above-named defendants, allege and show to the Court as follows:

## <u>INTRODUCTION</u>

    1.    This is a civil rights case brought under 42 U.S.C. §1983, the Fourteenth Amendment to the U.S. Constitution, and state law as a result of the defendants' objectively unreasonable, deliberately indifferent and/or negligent failure to obtain emergency medical

treatment for Randy D. Glenn's objectively serious medical condition while he was in custody of Waukesha County causing his preventable death.

2.    Well-established constitutional law provides that when the government takes individuals into its custody so that they are no longer able to take steps to protect their own health, the government must provide adequate medical care to such individuals. *See Wesley v. Armor Corr. Health Servs.*, 2022 U.S. Dist. LEXIS 202045, *25 (E.D. Wis. Nov. 7, 2022) ("the Fourteenth Amendment Due Process Clause governs" claims of pretrial detainees for deprivation of medical care); *see also Miranda v. City of Lake*, 900 F.3d 335, 352 (7th Cir. 2018) (same); *see Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976) ("An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met.").

3.    Pre-trial detainees' constitutional right under the Fourteenth Amendment to receive adequate medical care for serious medical conditions is clearly established. *See Mitchell v. Kallas*, 895 F.3d 492, 499 (7th Cir. 2018) ("Prison officials have been on notice for years that leaving serious medical conditions … untreated can amount to unconstitutional deliberate indifference."); *see McRaven v. Sanders*, 577 F.3d 974, 980 (8th Cir. 2009) ("a detainee's right to medical treatment is clearly established."); that pursuant to this clearly established federal law, when a pre-trial detainee has recently taken what appears to be a controlled substance or has attempted to dispose of what appears to be a controlled substance by ingestion, this constitutes a serious and emergent medical condition that requires emergency transport to a medical facility for medical clearance.

4.    Case law decided prior to Randy D. Glenn's death holds that a pretrial detainee's constitutional right to receive medical care when he is in obvious physical distress, especially after a suspected or actual recent ingestion of controlled substances, is clearly established for purposes of qualified immunity. *See Sandoval v. County of San Diego*, 985 F.3d 657, 679-81 (9th Cir. 2021)

- 2 -

(denying qualified immunity to nurse—who knew pretrial detainee was sweating, lethargic and disoriented and was told he needed to be looked at "more thoroughly," but did only blood sugar test, and did not monitor nor communicate his condition to next shift, leading to his death from overdose of methamphetamine—because it was clearly established by 2018 that detainee had right to medical care); *see Gomez v. City of Memphis*, 2023 U.S. App. LEXIS 20180 at *16-17 (6th Cir. 2023) (denying summary judgment based on qualified immunity because pre-trial detainee's right to medical treatment for a serious medical need was clearly established under circumstances where detainee had ingested an unknown amount of marijuana and may have ingested other substances in his possession); *Thompson v. King*, 730 F.3d 742, 745-46, 750 (8th Cir. 2013) (affirming denial of qualified immunity to officer who booked pretrial detainee, who denied taking anything except his prescribed seizure medication but displayed obvious signs of intoxication, when officer ignored warning that detainee needed help, and detainee was found dead from multiple drug intoxication because "a reasonable officer would know that it is unlawful to delay medical treatment for a detainee exhibiting obvious signs of medical distress."); *Vogt v. Crow Wing County*, 2021 U.S. Dist. LEXIS 249275 at *20 (D. Minn. Nov. 1, 2021) (denying qualified immunity where pre-trial detainee had been searched, but ingested two small bags of methamphetamine in the jail restroom, was exhibiting tremors, sweating profusely, stated he was not sure what he took, and died after being placed in cell because it was "clearly established by 2008 that a pretrial detainee … has a right to be free from deliberately indifferent denials of emergency medical care."); *Willis v. Cook County*, 2024 U.S. Dist. LEXIS 230652 at *8 (N.D. Ill. Dec. 20, 2024) (denying qualified immunity to correctional officer who observed pretrial detainee lose consciousness and stumble to his bunk but did not subsequently check on him and detainee died from overdosing on opioids he

- 3 -

had hidden under his mattress because "a detainee's constitutional right to receive adequate medical care is clearly established law.").

5.     It is also clearly established that police officers have a particularly well-established duty to intervene when they witness constitutional violations by their fellow officers. *See Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir. 1972).

6.     Despite this clearly established law and knowing that there was a probability that Glenn had ingested controlled substances in the strip search area of the Jail and/or was displaying obvious signs of drug intoxication requiring that Glenn be immediately transported from the Jail to a medical facility for emergency medical treatment and clearance, defendants and Nurse Deborah Link did not obtain any medical care or clearance for Glenn, and placed him in jail cell where he died from an overdose of controlled substances.

7.     Waukesha County's duty to provide constitutionally adequate medical care was non-delegable pursuant to well-established law. *See King v. Kramer*, 680 F.3d 1013, 1020 (7th Cir. 2012).

8.     Plaintiffs seek all damages available, including, but not limited to, pain and suffering, wrongful death, loss of society and companionship, and hedonic and punitive damages, caused by defendants' and Nurse Link's conduct.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over the claims brought in this Complaint pursuant to 28 U.S.C. § 1331 (federal question) 28, U.S.C. §1988 and § 1343 (civil rights), and has supplemental jurisdiction over all state law claims under 28 U.S.C. § 1367.

10.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 as the incident that forms the basis of this Complaint occurred in Waukesha County, which is in the Eastern District of Wisconsin—Milwaukee Division.

- 4 -

## PARTIES

11.     That at all times material hereto, the decedent, Randy D. Glenn, was an adult citizen and resident of the State of Wisconsin, and was the husband of Sachet Glenn, residing at 8546 West Appleton Avenue, Apt. 2, Milwaukee, WI 53225.

12.     That at all times material hereto, the plaintiff, Sachet Glenn, is an adult resident and citizen of the State of Wisconsin, and is currently residing at 3425 N. 67th Street, Milwaukee, WI 53216; that on May 29, 2025, Sachet Glenn was appointed Special Administrator of the Estate of Randy D. Glenn for purposes of pursuing a claim on behalf of the Estate; that she is also pursuing claims on her own behalf and on behalf of her minor children in this action.

13.     That at all times material hereto, the plaintiff, A.A.G., is a resident and citizen of the State of Wisconsin and is the minor child of Randy and Sachet Glenn, currently residing at 3425 N. 67th Street, Milwaukee, WI 53216.

14.     That at all times material hereto, the plaintiff, A.Z.G., is a resident and citizen of the State of Wisconsin, and is the minor child of Randy and Sachet Glenn, currently residing at 3425 N. 67th Street, Milwaukee, WI 53216

15.     That at all times material hereto, the plaintiff, A.C.G., is a resident and citizen of the State of Wisconsin, and is the minor child of Randy and Sachet Glenn, currently residing at 3425 N. 67th Street, Milwaukee, WI 53216.

16.     That at all times material hereto, the plaintiff, A.D.G., is a resident and citizen of the State of Wisconsin, and is the minor child of Randy and Sachet Glenn, currently residing at 3425 N. 67th Street, Milwaukee, WI 53216.

17.     That at all times material hereto, the defendant, Waukesha County, is a municipal corporation organized under the laws of the State of Wisconsin, with offices located at 515 W. Moreland Blvd. Room 120, Waukesha, WI 53188; that at all times material hereto, Waukesha

County operated and maintained the Waukesha County Sheriff's Office and the Waukesha County Jail; that pursuant to Wis. Stat. §895.46, Waukesha County is vicariously liable for its employees and is liable pursuant to Wis. Stat. § 895.46(1)(a) to pay or indemnify any judgment entered against the individual employee- or former-employee defendants in this action, including any compensatory and punitive damages, attorney's fees and costs awarded, as said defendants were acting under color of state law and within the scope of their employment when committing the acts described herein.

18.     That at all times material hereto, the defendant, Eric J. Severson, is an adult resident and citizen of the State of Wisconsin, and the Sheriff for Waukesha County and in that capacity, he is responsible for running the Waukesha County Jail, as well the training, supervision and discipline of sheriff's department employees, adopting, implementing and enforcing policies and practices, and ensuring that the treatment of individuals is in accordance with the U.S. Constitution and other federal, state and local laws; that at all times material hereto, Sheriff Severson was acting under color of law and within the scope of his employment for Waukesha County, and is being sued in his official capacity.

19.     That the defendant, Johanna J. Grace, is an adult resident and citizen of the State of Wisconsin, currently residing at 2612 W. Hadley Street, Milwaukee, WI 53206; that at all times material hereto, Johanna J. Grace was employed as a Lieutenant with the Waukesha County Sheriff Department, was acting under color of law and within the scope of her employment for Waukesha County, and is being sued in her individual capacity.

20.     That at all times material hereto, the defendants, ABC Insurance Companies, are the fictitious names for unknown insurance companies, the identity and location of which is unknown, which are engaged in the business of writing and selling liability insurance; that upon information and belief, prior to the date of the incident at issue herein, ABC Insurance Cos. issued

- 6 -

a policy or policies of liability insurance to Waukesha County and/or the Waukesha County Sheriff's Department, for claims such as those hereinafter set forth; that said policy or policies of insurance were in full force and effect at the time of the incident described below; that in said contract(s) of insurance, ABC Insurance Cos. reserved the right to settle or adjust any claims arising hereunder and to defend any lawsuits instituted by virtue of any such claims and have a direct interest in this litigation; that ABC Insurance Cos. are proper defendants and are directly liable to the plaintiffs for all of their injuries and damages pursuant to Wis. Stat. §632.24, for claims against its insureds, agents and employees, including Johanna J. Grace, such as those alleged herein regardless of an insured's bankruptcy or insolvency; that pursuant to Wis. Stat. §807.12, ABC Insurance Cos. are being inserted in place of the real and proper insurance company defendants, which as soon as their identity is ascertained will be substituted in place of ABC Insurance Cos.

21.     That at all times material hereto, the defendant, Zurich American Insurance Company is a foreign insurance company, duly licensed to do business in the State of Wisconsin, with offices of its Registered Agent, Corporation Service Company located at 33 E. Main Street, Suite 610, Madison, WI 53703; that Zurich American Insurance Company is engaged in the business of writing and selling liability insurance; that upon information and belief, prior to the date of the matter described herein, Zurich American Insurance Company had issued a policy or policies of insurance to Wellpath Holdings, Inc. and/or Wellpath, LLC (formerly known as Correct Care Solutions, LLC) for claims such as those hereafter set forth; that such policy(ies) provided coverage to said provider and its insureds, agents and employees, including Deborah J. Link, for claims such as those set forth in this Complaint, and which policy(ies) of insurance were in full force and effect at the time of the hereinafter described matter; that in said contract(s) of insurance,

Zurich American Insurance Company reserved the right to adjust any claims arising thereunder and to defend any lawsuits instituted by virtue of any such claims and has a direct interest in this litigation; that Zurich American Insurance Company is directly liable to the plaintiffs pursuant to the direct action statute, Wis. Stat. §632.24, for claims against its insureds and employees and agents of its insureds such as those alleged herein regardless of an insured's bankruptcy or insolvency; that by reason of Wis. Stat. § 803.04(2), Zurich American Insurance Company is a proper party defendant in this action and is directly liable to the plaintiffs for all of their injuries and damages as hereafter alleged.

22.     That at all times material hereto, the defendant, Universal Underwriters of Texas Insurance Company ("Texas Insurance Company") is a foreign insurance company, duly licensed to do business in the State of Wisconsin, with offices of its Registered Agent, Corporation Service Company located at 33 E. Main Street, Suite 610, Madison, WI 53703; that Texas Insurance Company is engaged in the business of writing and selling liability insurance; that upon information and belief, prior to the date of the matter described herein, Texas Insurance Company had issued a policy or policies of insurance to Wellpath Holdings, Inc. and/or Wellpath, LLC for claims such as those hereafter set forth; that such policy(ies) provided coverage to said provider and its insureds, agents and employees, including Deborah J. Link, for claims such as those set forth in this Complaint, and which policy(ies) of insurance were in full force and effect at the time of the hereinafter described matter; that in said contract(s) of insurance, Texas Insurance Company reserved the right to adjust any claims arising thereunder and to defend any lawsuits instituted by virtue of any such claims and has a direct interest in this litigation; that Texas Insurance Company is directly liable to the plaintiffs pursuant to the direct action statute, Wis. Stat. §632.24, for claims against its insureds and employees and agents of its insureds such as those alleged herein regardless

of an insured's bankruptcy or insolvency; that by reason of Wis. Stat. § 803.04(2), Texas Insurance Company is a proper party defendant in this action and is directly liable to the plaintiffs for all of their injuries and damages as hereafter alleged.

23.     That at all times material hereto, the defendants, DEF Insurance Companies, are the fictitious names for unknown insurance companies, the identity and location of which is unknown, which are engaged in the business of writing and selling liability insurance; that upon information and belief, prior to the date of the incident at issue herein, DEF Insurance Cos. issued a policy or policies of liability insurance to Wellpath Holdings and/or Wellpath LLC (previously known as Correct Care Solutions, LLC, and collectively referred to herein as "Wellpath"), for claims such as those hereinafter set forth; that said policy or policies of insurance were in full force and effect at the time of the incident described below; that in said contract(s) of insurance, DEF Insurance Cos. reserved the right to settle or adjust any claims arising hereunder and to defend any lawsuits instituted by virtue of any such claims and have a direct interest in this litigation; that DEF Insurance Cos. are proper defendants and are directly liable to the plaintiffs for all of their injuries and damages pursuant to Wis. Stat. §632.24, for claims against its insureds, agents and employees such as those alleged herein regardless of an insured's bankruptcy or insolvency; that pursuant to Wis. Stat. § 807.12, DEF Insurance Cos. are being inserted in place of the real and proper insurance company defendants, which as soon as their identity is ascertained will be substituted in place of DEF Insurance Cos.

24.     That at all times material hereto, Waukesha County had contracted with Wellpath for Wellpath to provide some of the medical care for individuals housed in the Waukesha County Jail, but that regardless of its contract with Wellpath, Waukesha County's duty to provide

- 9 -

constitutionally adequate medical care was non-delegable pursuant to well-established law. *See King v. Kramer*, 680 F.3d 1013, 1020 (7th Cir. 2012).

25.    That at all times material hereto, Deborah J. Link was employed as a Nurse for Wellpath, LLC to provide some medical care to inmates and pretrial detainees at the Waukesha County Jail and was acting within the scope of her employment with Wellpath, LLC.

## **GENERAL ALLEGATIONS**

### **I.  The Arrest, Detention and Preventable In-Custody Death of Randy D. Glenn on January 16-17, 2023.**

26.    On January 16, 2023, at approximately 4:00 p.m., thirty-four-year-old Randy D. Glenn was arrested and taken into custody during a traffic stop for an alleged probation violation; that during a search of his vehicle, an officer found a couple of small digital pocket scales and a bag containing a green leafy substance, and Glenn was transported to the Waukesha County Jail.

27.    Upon arrival to the Waukesha County Jail, corrections officer Alejandro Albiter was responsible for booking Glenn; that Officer Albiter patted down Glenn, and in response to questions Officer Albiter asked during intake, Glenn denied having Covid symptoms or exposure and denied taking any substances, including alcohol or drugs.

28.    Officer Albiter patted Glenn down a second time and checked him through a body scanner with no noted concerns, but that on the actual body scan, there were areas of dark shading in the groin area and that Glenn's hands were over the areas of his pants pockets.

29.    During a subsequent strip search, Glenn undressed in a dressing stall and handed his clothes to Officer Albiter; that almost immediately, Glenn turned his back to Officer Albiter, who saw Glenn place both of his hands towards his mouth three to four times as if he were forcefully put something down his throat; that Officer Albiter believed Glenn was trying to ingest contraband as he heard choking or gagging sounds and observed Glenn's mouth was puffed up as

- 10 -

if something were inside; that because Officer Albiter could not enter the stall without backup and he believed Glenn was trying to get rid of contraband, he immediately called for help.

30.     Lieutenant Johanna Grace and correctional officer Johnathan Barry responded; that Officer Albiter entered the stall while Glenn continued to force what was in his mouth down his throat; that Officer Albiter stabilized Glenn against a wall and secured his hands behind his back; that a clear empty plastic bag and pieces of plastic fell from Glenn's mouth; that Glenn declined to disclose what he swallowed, stating that the police would "link the plastic bag to whatever they found in his car."

31.     Lieutenant Grace reported locating two plastic bags on the floor after this encounter with Glenn; that she described one of them as being "knotted off," and that Glenn stated it was "weed," and that he did not want another charge.

32.     Glenn was then brought to the booking area and Lieutenant Grace called Nurse Deborah J. Link to further medically evaluate Glenn; that Nurse Link was told there was a likely drug ingestion given Glenn's attempted or actual ingestion of several plastic bags and his choking; that Nurse Link asked Glenn several times what he had swallowed and he told her he tried to eat the plastic bags because they continued marijuana residue.

33.     Nurse Link did not ask Glenn any medical questions nor obtain any of his vital signs; that she did not send Glenn to a hospital for medical clearance nor put him on any medical protocol, but instead, medically cleared him and admitted him into the Jail, stating "he is fine."

34.     Both Lieutenant Grace and Officer Albiter were present when Nurse Link spoke to Glenn; that Officer Albiter was uncomfortable with Nurse Link's assessment, but relied on Lieutenant Grace to take the necessary steps to ensure Glenn was medically cleared and/or received adequate medical care, including emergency transport to the hospital; that during a subsequent

investigation into the death of Glenn, Officer Albiter stated that he was "uneasy" with Nurse Link's assessment and believed that Glenn should have been transported to the hospital.

35.     Officer Albiter strip searched Glenn for a second time and sometime after 5:00 p.m., Glenn was placed in TC3, a transfer corridor cell, which is a "dry cell" without running water or a toilet located between the intake area and the transfer corridor of the Jail; that protocol required that individuals housed in this area be checked every fifteen minutes.

36.     At approximately 7:00 p.m., video surveillance showed Glenn showing signs of discomfort in his cell, including wiping his face and head with his shirt, then removing his shirt to fan himself, and that he was noticeably and profusely sweating.

37.     At approximately 7:29 p.m., Officer Barry and another officer removed Glenn from his cell to complete the booking process; that Glenn abruptly moved his head to avoid hitting a door that was nowhere near him, which made Officer Barry concerned given how Glenn was moving and his slurred speech; that while Glenn was using the bathroom, Officer Barry specifically told Lieutenant Grace that Glenn was under the influence of something, that Glenn was having balance issues and that his pupils were constricted to the size of needles—a sign of drug intoxication; that when Glenn exited the bathroom, he was sweating so profusely that he was given a towel to wipe the sweat from his face and head.

38.     Given the signs of drug intoxication, Officer Barry was concerned that Glenn had opioids in his system and shared his concerns with Lieutenant Grace; that Officer Barry relied on Lieutenant Grace to take the necessary steps to ensure Glenn was medically cleared and/or received adequate medical care, including emergency transport to the hospital.

39.     When Glenn exited the bathroom, Lieutenant Grace was also concerned because she observed that Glenn appeared to be under the influence as he was sweating and his eyes were

wide and glossy; that despite these observations which indicated a serious and emergent medical condition, Lieutenant Grace did not arrange for Glenn to be transported, emergently or otherwise, to a medical facility for medical clearance.

40.     During the booking process, Glenn signed an authorization for medical treatment, reflecting that he agreed to medical care; that during booking, the Waukesha County Sheriff Inmate Medical/Mental Health History questionnaire was completed for Glenn and a question related to abnormal sweating was marked "yes," and it was noted that Glenn was "sweating profusely" but did not have an elevated temperature; that it also stated that shift supervisor Lieutenant Grace was notified of medical concerns regarding Glenn; that at the bottom of the questionnaire is a handwritten note "0 MDV Concerns 1-16-23 D. Link" reflecting Nurse Link also reviewed the questionnaire and signed off; that both Lieutenant Grace and Nurse Link concluded that Glenn had no medical needs despite his obvious symptoms.

41.     Officer Barry participated in the completion of Glenn's booking process and noticed a pronounced change in Glenn's condition between the time of the original strip search and probable ingestion and approximately two hours later when booking was completed.

42.     At approximately 7:45-7:52 p.m., video surveillance shows Glenn was still sweating profusely, wiping his face with his shirt while being fingerprinted and that he was given paper toweling to wipe his face before his booking photograph was taken.

43.     At the end of the booking process, Officer Albiter observed that Glenn was sweating so much that the neck area of his t-shirt was wet, and that Glenn had not been like that when he first entered the jail.

44.     The officers returned Glenn to his cell at approximately 7:53 p.m.

- 13 -

45.     At approximately 8 p.m., Lieutenant Grace spoke with her captain near the end of the captain's shift but did not mention anything about Glenn's changing condition; that when the captain ended her shift, Lieutenant Grace became the officer in charge of the jail.

46.     Between 9:35 and 9:40 p.m., Nurse Link went to Glenn's cell for a hydration check, which is to be completed by the Jail Nurse once per shift, and during which the nurse is to examine the inmate's eyes and/or mouth to ensure that the inmate is hydrated; that the video surveillance does not show Nurse Link actually conducting the hydration check on Glenn or her taking any vitals or temperature reading from Glenn, but that it does show Glenn wiping a lot of sweat from his head, that he had his shirt up, and was having balance problems.

47.     Lieutenant Grace and Officer Barry were also present at Glenn's cell during what was supposed to be the "hydration check"; that Officer Barry was concerned about Glenn and told Nurse Link and Lieutenant Grace about Glenn's worsening condition, including slurred speech, having pinpoint pupils and difficulty with depth perception and balance—all signs of drug intoxication; that Nurse Link nodded her head in response to Officer Barry reflecting that she was listening; that Nurse Link observed Glenn and stated, "you weren't like this when I initially did the assessment," and "[n]ow I'm doubting myself about not sending you out to the hospital."

48.     Officer Barry heard Nurse Link make these statements to Glenn, and overheard a conversation between Nurse Link and Lieutenant Grace where Lieutenant Grace asked Nurse Link if they should send Glenn to the hospital, stating "if you want to send him out we can do that, he's on checks already," and that Nurse Link replied that Glenn could die within the timeframe of the checks; that Nurse Link and Lieutenant Grace discussed that a urinalysis would show whether there were drugs; that despite this conversation, at no time did Nurse Link and/or Lieutenant Grace send Glenn to a medical facility, order a urinalysis, or place him on a medical watch.

- 14 -

49. Despite being told about and noticing Glenn's deteriorating condition since he had been booked, Lieutenant Grace did nothing as shift supervisor and the officer in charge of the Jail to obtain the necessary immediate medical attention or medical clearance for Glenn.

50. At approximately 10:46 p.m., Nurse Link made an entry into the Wellpath record, but erroneously entered it under the name of another inmate who was a relative of Glenn's; that the entry stated, "1/16/23 2000 called to intake pet LT had a baggy on person states he was chewing on it alert and orientated x3 denies taking any med;" that this is the only known progress note regarding Glenn's ingestion or his physical condition.

51. At 11:00 p.m., when Nurse Link ended her shift, the only information she communicated in passing to the night-shift was that an inmate may have ingested something during intake, but that he denied it.

52. At 11:00 p.m., Lieutenant Grace also ended her shift and the next officer in charge read Lieutenant Grace's shift log, which did not mention the probable ingestion of drugs by Glenn; that Lieutenant Grace told the next-shift officer that Officer Albiter saw Glenn put something in his mouth but turned it over before ingesting it; that Lieutenant Grace communicated nothing regarding her observations of Glenn's deteriorating conditions.

53. The video surveillance shows no observable movement by Glenn after 4:34 a.m. on January 17, 2023.

54. At 6:05 a.m., Glenn was discovered dead in his jail cell.

55. An autopsy by the Waukesha County Medical Examiner found five clear sandwich-type bags in Glenn's stomach along with several tied off bags containing white chunky material that was later determined to be cocaine.

- 15 -

56. Glenn's cause of death was determined to be from toxic effects of fentanyl, heroin, D-methamphetamine and cocaine.

57. During an investigation into the death of Glenn, Lieutenant Grace acknowledged that Glenn's death could have been prevented, that she noticed his condition deteriorating from the time he was booked to the end of her shift, and that he should have been sent to the hospital; that during this investigation, Nurse Link also admitted "we probably dropped the ball," and later admitted that she could have sent Glenn out at 9:30 p.m. but she did not.

58. The lead investigator in the investigation into Glenn's death found the evidence reflected that the drugs in Glenn's system were ingested in the Jail.

59. Once an individual is in custody, they are required to be transported to the hospital in an emergency situation, which includes a suspected or probable recent ingestion of controlled substances.

60. The investigation into Glenn's death found that he never declined to go to the hospital.

**II.    The Termination of the Employment of Nurse Link and Lieutenant Grace**

61. Following Glenn's death, Waukesha County Sheriff revoked the security clearance of Nurse Link and she no longer works for Wellpath, LLC or at the Waukesha County Jail.

62. On or about April 18, 2023, Waukesha County terminated Lieutenant Grace's employment.

**III.    The Duty of Care of Johanna J. Grace, Waukesha County, Eric J. Severson Wellpath and Deborah J. Link, and Their Violation of Randy D. Glenn's Constitutional and/or State-Law Rights**

**A. The Duty of Care of Johanna J. Grace**

63. At all times relevant hereto Lieutenant Grace had a duty to ensure that pre-trial detainees like Glenn—who were observed actually ingesting or attempting to ingest controlled

- 16 -

substances and were exhibiting clear signs of drug intoxication and/or overdose—are immediately transported to a medical facility for medical attention and medical clearance, had a duty to intervene and call an ambulance when others were not ensuring such steps were taken, and had a duty to report actual or attempted ingestion of controlled substances and clear signs of drug intoxication and/or overdose in the shift log, to the medical staff, to her superiors, and the next-shift officer, among other duties.

### B. The Duty of Care of Waukesha County and Sheriff Eric J. Severson

64.     At all times relevant hereto, Waukesha County and Sheriff Eric J. Severson had a non-delegable duty to provide constitutionally adequate medical care and services to all detainees in its Jail, including Glenn, and had a duty to implement policies and procedures governing inmates in need of emergent medical attention to include situations in which an officer believes that the person in custody has recently taken what appears to be a controlled substance, including situations in which the person has attempted to dispose of the substance by ingestion, and to require that when an inmate places something in his/her mouth that the member believes may be a controlled substance, it shall constitute evidence of ingestion and the individual must be emergently transported to a medical facility to be medically cleared prior to booking.

### C. The Duty of Care of Wellpath, and Deborah J. Link

65.     At all times relevant hereto, Wellpath and its employee, Deborah J. Link, had a duty of reasonable care to provide medical care and treatment to all detainees in the Jail, including Glenn, which duty required them to use the degree of care, skill and judgment which reasonable health care providers would use in the same or similar circumstances; that under the circumstances of this case and pursuant to applicable law and corrections and medical standards, Wellpath and Nurse Link had a duty to recognize that a pre-trial detainee like Glenn—who was known to have recently ingested or attempted to ingest controlled substances and was exhibiting clear signs of

drug intoxication and/or overdose—had a known, emergent and objectively serious medical condition requiring them to provide immediate medical attention, including emergency transport to a medical facility for medical treatment and/or clearance, among other duties.

### D. The Breach of the Duty of Care of Johanna J. Grace, Waukesha County, Eric J. Severson, Wellpath and Deborah J. Link, and Plaintiffs' Resulting Damages

66.     At all times material hereto, the defendants, Nurse Link and Wellpath breached their duties of care and were negligent and/or objectively unreasonable and/or deliberately indifferent to his Glenn's known, emergent and objectively serious medical needs.

67.     As a direct and proximate result of the conduct of the defendants, Nurse Link and Wellpath, Glenn suffered physical and emotional pain and suffering and died while in defendants' custody, and plaintiffs are entitled to all available damages related thereto.

## CLAIMS FOR RELIEF

### First Claim for Relief — 42 U.S.C. §1983
### Johanna J. Grace's Violation of Randy D. Glenn's Fourteenth Amendment Rights

68.     Plaintiffs reallege and incorporate by reference the allegations of the preceding paragraphs.

69.     Despite being summoned to the strip search area where Glenn continued to force what was in his mouth down his throat and observing Glenn spit out a clear empty plastic bag and seeing pieces of plastic fall from Glenn's mouth and knowing that he had likely ingested controlled substances, Lieutenant Grace acted objectively unreasonably and was also deliberately indifferent to Glenn's known and objectively serious medical condition and needs in that she did not ensure that Glenn was adequately medically cleared, did not call an ambulance to transport him to a medical facility for medical attention and medical clearance, did not did not intervene when Nurse Link indicated that Glenn was "fine," did nothing at 7:30 p.m. when Officer Barry again told her Glenn was having balance issues and that his pupils were constricted to the size of needles and she

observed Glenn exit the bathroom while appearing to be under the influence as he was sweating and his eyes were wide and glossy, did not mention Glenn's worsening condition when she spoke with her captain at approximately 8 p.m., did not mention the potential ingestion by Glenn in her shift log, and did not adequately communicate the events and Glenn's condition to the next-shift officer in charge of the jail, and was otherwise objectively unreasonable and/or deliberately indifferent to Glenn's serious medical needs.

70.    That Lieutenant Grace's unlawful conduct, including her objectively unreasonable conduct and/or deliberate indifference to Glenn's known and objectively serious medical needs, violated Glenn's rights under the Fourteenth Amendment.

71.    Lieutenant Grace's violation of Glenn's constitutional rights was a direct and proximate cause of Glenn's injuries and death and all of plaintiffs' damages.

### Second Claim for Relief — 42 U.S.C. §1983
### Johanna J. Grace's Failure to Intervene

72.    Plaintiffs reallege and incorporate by reference the allegations of the preceding paragraphs.

73.    Johanna J. Grace had a constitutional duty to attend to the objectively serious medical needs of persons in custody and knew that if she or staff believed a person in custody had recently ingested or attempted to ingest a controlled substance, she or staff was required to arrange for that person to be emergently transported via ambulance to a medical facility for medical treatment and clearance, but that she  and other staff failed to make such arrangements, thereby violating Glenn's constitutional rights.

74.    Johanna J. Grace had a duty to intervene and prevent the unconstitutional conduct of other staff in failing to arrange for emergency medical transport and treatment for Glenn, and had multiple opportunities to intervene to prevent the other staff members' violation of Glenn's

- 19 -

constitutional rights, but Officer Grace failed to intervene.

75.    Officer Grace's failure to intervene was a further violation of Glenn's constitutional rights and was a direct and proximate cause of Glenn's injuries and death and all of plaintiffs' damages.

### Third Claim for Relief — *Monell* Claim Against Sheriff Eric J. Severson and Waukesha County

76.    Plaintiffs reallege and incorporate by reference the allegations of the preceding paragraphs.

77.    Waukesha County and Sheriff Severson had a non-delegable duty to provide adequate medical care to inmates and pretrial detainees, and contracting out some medical care to a private entity like Wellpath did not relieve them of their constitutional duty to provide adequate medical care and treatment to those in their custody.

78.    By law, Sheriff Severson was a policymaker for Waukesha County when operating the Waukesha County Jail, and it was his responsibility to enact policies and procedures that ensured that appropriate medical care was provided to inmates and detainees in the Jail in accordance with applicable constitutional law and correctional and medical standards.

79.    As of November 16, 2017, years before Glenn's death, the Milwaukee Police Department, consistent with applicable law, enacted a Standard Operating Procedure 909 governing "Prisoners and Booking," which contained section 090.15 entitled "Prisoners in Need of Medical Attention," which provides:

> Emergency physical illness shall include those instances when an officer believes that the person in custody has recently taken what appears to be a controlled substance, especially in cases where it appears that the person has attempted to dispose of the substance by ingestion.  If a prisoner puts something in his/her mouth that the member believes may be a controlled substance, this shall constitute evidence of ingestion and the prisoner must be medically cleared prior to booking.

80.     Pursuant to this same Milwaukee Police Department SOP 090.15, individuals conveyed to a medical facility because of an apparent emergency physical illness "shall be conveyed by ambulance or fire department paramedic unit."

81.     Sheriff Severson and Waukesha County failed to enact and implement a policy and procedure similar or equivalent to Milwaukee Police Department SOP 090.15 governing inmates and pre-trial detainees in need of emergent medical attention to include situations in which an officer believes that the person in custody has recently taken what appears to be a controlled substance, or appears to have attempted to dispose of the substance by ingestion, and to require that when an inmate places something in his/her mouth that the officer believes may be a controlled substance, it shall constitute evidence of ingestion and the inmate must be emergently transported to a medical facility to be medically cleared prior to booking.

82.     Sheriff Severson and Waukesha County's failure to enact and implement a similar or equivalent policy and procedure mandating emergency treatment and clearance for inmates who have recently ingested controlled substances or attempted to do so, and their failure to train, supervise and discipline their employees and agents regarding such policy and procedure created a de facto policy of ignoring the clearly established constitutional mandate to provide adequate medical care to those in custody and results in those individuals in custody who have recently taken what appears to be a controlled substance, or appears to have attempted to dispose of the substance by ingestion not being immediately sent out for medical clearance, and is objectively unreasonable and/or deliberately indifferent to such known, emergent and objectively serious medical needs.

83.     Sheriff Severson and Waukesha County's de facto policy of objectively unreasonable conduct and deliberate indifference to inmates' objectively serious medical needs

was a cause of the failure to obtain emergent medical treatment and clearance for Glenn under circumstances where it was probable that he had ingested or attempted to ingest controlled substances while in the custody of Waukesha County.

84. Sheriff Severson and Waukesha County's violation of Glenn's constitutional rights was a direct and proximate cause of Glenn's injuries and death and all of plaintiffs' damages.

**Fourth Claim for Relief— Negligence as it Relates to Deborah J. Link and the Defendant Insurers' Obligation to Indemnify**

85. Plaintiffs reallege and incorporate by reference the allegations of the preceding paragraphs.

86. Nurse Link had a duty to provide medical care Randy D. Glenn at all times material hereto, which duty required her to use the degree of care, skill and judgment usually exercised by a reasonable health care provider in the same or similar circumstances.

87. Despite knowing that Glenn had recently and likely ingested controlled substances while in the strip search area, Nurse Link breached her duty of care to Glenn in that she did not ask Glenn any medical questions or obtain any vital signs from Glenn; did not send Glenn to a medical facility for medical attention or clearance or put him on any medical protocol or watch, did not reference the ingestion or suspected ingestion of controlled substances on Glenn's Waukesha County Sheriff Inmate Medical/Mental Health History but instead admitted him into the Jail, stating "he is fine"; furthermore, that later, she did not perform a proper hydration cell check on Glenn despite knowing that his condition was worsening, including having pinpoint pupils and difficulty with depth perception and balance, and that he wasn't "like this when [she] initially did the assessment"; that additionally, she erroneously placed an entry regarding Glenn under another inmate's name and failed to properly communicate Glenn's condition to the night shift nurse, and was otherwise negligent.

- 22 -

88.     Nurse Link's negligence was a direct and proximate cause of Glenn's injuries and death and all of plaintiffs' damages, and the defendant insurers have a duty to defend and indemnify this claim pursuant to Wis. Stat. §632.24.

### Fifth Claim for Relief—Vicarious Liability As it Relates to Wellpath and the Defendant Insurers' Obligation to Indemnify

89.     Plaintiffs reallege and incorporate herein by reference the allegations of the preceding paragraphs.

90.     Wellpath has obligations to the plaintiff under respondeat superior and/or the doctrine of principal and agent for the negligent acts of its agents, servants and/or employees, and any individual acting with their real or apparent authority and/or any individual over whom Wellpath, had supervisory control and responsibility with respect to the healthcare provided to its patients, including but not limited to Deborah J. Link, and the defendant insurers have a duty to defend and indemnify Wellpath's respondeat superior obligations pursuant to Wis. Stat. §632.24.

### Sixth Claim for Relief — Wrongful Death Against All Defendants (Federal and State Law)

91.     Plaintiffs reallege and incorporate by reference the allegations of the preceding paragraphs.

92.     That as a result of the wrongful conduct alleged herein, and the resulting injuries and death of Randy D. Glenn, as set forth above, the plaintiffs were injured and sustained wrongful death damages, including pre-death pain and suffering, funeral and burial expenses, loss of society and companionship and loss of consortium damages, and all other damages allowed under federal and state law in an amount to be determined at a trial of this matter.

### Seventh Claim for Relief — Punitive Damages

93.     Reallege and incorporate herein by reference the allegations of the preceding paragraphs.

- 23 -

94.     The above-described conduct of Lieutenant Grace was done maliciously and/or with intentional disregard of the rights of Glenn and the plaintiffs.

95.     That such conduct on the part of Lieutenant Grace was a cause of Glenn's injuries and death and all of plaintiffs' damages.

WHEREFORE, the plaintiffs demand judgment as follows:

a.      For compensatory and punitive damages on behalf of the Estate of Randy Glenn, in an amount to be determined at a trial of this matter;

b.      For compensatory and punitive damages on behalf of Sachet Glenn, in an amount to be determined at a trial of this matter;

c.      For compensatory and punitive damages on behalf of each of the minor children, A.A.G., A.Z.G., A.C.G., and A.D.G.;

d.      For damages against defendant, Waukesha County, for its liability pursuant to Wis. Stat. §895.46, in an amount to be determined at a trial of this matter; and

e.      For all costs, disbursements and actual attorney's fees pursuant to 42 U.S.C. §1988, and for such other relief as the Court deems just and equitable.

**PLEASE TAKE NOTICE THAT THE PLAINTIFFS HEREBY DEMAND A JURY TRIAL IN THE ABOVE-ENTITLED ACTION.**

Dated at Milwaukee, Wisconsin this 30th day of December, 2025.

GINGRAS, THOMSEN & WACHS LLP

s/ Mark L. Thomsen
Mark L. Thomsen, State Bar No. 1018839
Sarah F. Kaas, State Bar No. 1027895
219 N. Milwaukee St., Suite 520
Milwaukee, WI  53202
Phone: 414-935-5482
Fax:    414-763-6413
mthomsen@gtwlawyers.com
skaas@gtwlawyers.com

- 24 -